**SIGNED THIS: June 20, 2019**

_____
**Mary P. Gorman**
**United States Chief Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No. 17-91187 |
| BERNARD McCARTY, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| PREMIER NETWORK SOLUTIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 18-09003 |
| | ) | |
| BERNARD McCARTY, | ) | |
| | ) | |
| Defendant. | ) | |

# O P I N I O N

Before the Court for decision after trial is a complaint to determine the dischargeability of a debt allegedly owed by Bernard McCarty ("Debtor") to Premier Network Solutions, Inc. ("Premier Network"). Although the complaint is based on alternative legal theories, Premier Network did not meet its burden of proof on either theory. Accordingly, judgment will be entered in favor of the Debtor and against Premier Network. Any debt owed by the Debtor to Premier Network is included in his general discharge previously granted and is discharged.

## I. Factual and Procedural Background

The Debtor filed his voluntary petition under Chapter 7 on November 1, 2017. On his Schedule E/F: Creditors Who Have Unsecured Claims, the Debtor initially listed Premier Network as a nonpriority, unsecured creditor in the amount of $100,000. In a subsequently filed amended schedule, the Debtor again listed Premier Network as a nonpriority, unsecured creditor in the amount of $100,000 but expressly identified the debt as disputed. In further amended schedules, the Debtor reduced the amount of the alleged debt to Premier Network to $50,000 and again identified the debt as disputed. Similar information was included on the original Schedule E/F and both of the amendments with respect to a debt potentially owed to Tammy Surprenant, the owner of Premier Network. The claim of Ms. Surprenant was, however, identified as contingent, unliquidated, and disputed.

On the Statement of Financial Affairs filed with his petition, the Debtor answered a question about businesses in which he had an interest within the prior four years by only disclosing ownership in his company, Illiana Technology

-2-

Solutions. He described that business as having operated from May 2016 through December 2016. He did not originally schedule any interest in Premier Network. On February 20, 2019, the second day of trial, however, the Debtor filed an amended Schedule A/B disclosing a 50% ownership in Premier Network and adding claims of wrongful termination and breach of contract against Tammy Surprenant to his list of assets.

Premier Network initiated this adversary proceeding by filing a complaint requesting that any debt owed by the Debtor to Premier Network be excepted from his discharge. Premier Network alleged that the Debtor had been employed by it as an IT technician beginning in May 2014 but had been terminated on April 13, 2016. Premier Network said that the Debtor, at times both during his employment and after his termination, engaged in wrongful and unauthorized conduct in relation to Premier Network and its assets and operations. Specifically, Premier Network said that the Debtor made unauthorized charges on a company credit card, submitted unauthorized change of address forms with the United States Post Office and the Internal Revenue Service, took unauthorized possession of checks, software, and other assets of Premier Network, took possession of client passwords and the Premier Network usernames and passwords for software accounts used in its day-to-day business operations, and wrongfully took possession of Premier Network's business calendar and phone number. Premier Network alleged that the Debtor refused to return the wrongfully taken property and that Premier Network suffered a loss of clients and income due to the Debtor's conduct. According to Premier Network, the Debtor's actions were intentional, reckless, and done with malicious and willful disregard of Premier Network's

rights. Premier Network also alleged that the Debtor was a fiduciary to it.

The Debtor answered the complaint, admitting some of the factual statements but denying many of the most serious allegations. He also raised affirmative matters in his answer, claiming to be Tammy Surprenant's business partner and asserting that Premier Network suffered no damage from his conduct.

At the trial, Tammy Surprenant testified on behalf of Premier Network. She said that she and her former spouse co-owned DTI Office Solutions ("DTI"), a copier and IT service company. As part of her divorce, she was awarded the IT division of DTI, and she incorporated that IT division as Premier Network Solutions, Inc. Ms. Surprenant stated that Premier Network operated out of her home and that a post office box address was used for the company's mail. Premier Network held two bank accounts with First Financial Bank in Danville, Illinois, and a credit card account with Bank of America. Ms. Surprenant said that she is and has been, at all times, the only officer and sole shareholder of Premier Network. She identified a copy of the articles of incorporation that she had filed with the Illinois Secretary of State on May 30, 2014.

Ms. Surprenant acknowledged that she does not have any specialized training in or knowledge of information technology. Her responsibilities with Premier Network largely involve non-technological tasks such as bookkeeping, handling accounts receivable and payable, marketing, and meeting with clients. In order to actually provide IT services to clients, Ms. Surprenant hired the Debtor as an IT consultant. She explained that she had worked with the Debtor at DTI

and offered him employment when she started her new company.

In addition to their work relationship, Ms. Surprenant testified that she had a personal dating relationship with the Debtor that started prior to the formation of Premier Network. In fact, the Debtor had moved into Ms. Surprenant's home in November 2015, but their personal relationship deteriorated, and she asked the Debtor to move out on February 22, 2016.

Ms. Surprenant acknowledged that the Debtor, while employed by Premier Network, was issued a credit card for the company's Bank of America account. Shortly after the Debtor moved out of her home, she discovered that several charges had been made using the Debtor's company credit card. She testified that she learned from the charges on the credit card statement that the Debtor was staying at a Sleep Inn and Suites in Danville, Illinois. Although her testimony was unclear as to the precise timing, Ms. Surprenant said that she contacted Bank of America to place a hold on the Debtor's credit card. She later saw additional charges on the card for the hotel and for purchases at a Meijer store. She said that she protested the charges with Bank of America to no avail and later paid them to avoid late fees. She admitted that the Debtor's card was also later used for pre-authorized charges related to a Premier Network client and agreed that she had not intended to prevent those charges from being made.

Ms. Surprenant admitted that both she and the Debtor had previously used Premier Network credit cards for personal expenses such as meals and vacations. She maintained, however, that business discussions were the focus of their meals

and that the Debtor would usually conduct some work while on vacation.

Sometime after the Debtor left Tammy Surprenant's home, an address change was made for Premier Network with the United States Postal Service. Ms. Surprenant testified that she first learned of the address change from a client. She testified that the address change was to 801 Perrysville Avenue, Danville, Illinois. Ms. Surprenant alerted the post office of the unauthorized address change, and the address was changed back to the company's post office box. Additionally, Premier Network received a notice of address change from the Internal Revenue Service requesting verification of an address change to the Perrysville Avenue address. Ms. Surprenant stated that she informed the IRS that she had not authorized the address change.

Ms. Surprenant stated that she had never been to the Perrysville Avenue location prior to receiving the change of address notices. It was only after hearing of the address changes that she became aware that the Debtor was working out of that location. She testified that she subsequently visited the Perrysville Avenue location but only to collect checks from the Debtor or to access the Debtor's laptop for record keeping purposes.

With regard to the keeping of Premier Network's accounting records, Ms. Surprenant testified that she used Quickbooks to maintain records. She said that, in November 2015, her laptop was running slowly and that the Debtor believed that her laptop had a virus. She testified that, at the suggestion of the Debtor, the Quickbooks software was transferred to the Debtor's laptop so that her laptop

could be wiped. Ms. Surprenant said that, despite her insistence, the Quickbooks software was never transferred back to her laptop. She stated that she was unable to keep daily accounting records after that time because the Debtor limited her access to his laptop.

Ms. Surprenant testified that, in February 2016, she learned that a Danville Bell Credit Union ("DBCU") account had been opened in the name of Premier Network. Upon learning of the account, she informed DBCU that she had not authorized the opening of the account. She confirmed that the Debtor subsequently delivered two checks to her, in the amounts of $5000 and $1130.40, from DBCU as reimbursement and that both checks were then deposited into Premier Network's First Financial Bank account.

According to Ms. Surprenant, she terminated the Debtor's employment on April 13, 2016. Subsequently, she was informed by Jeff Williams, an IT technician hired to replace the Debtor, that there were problems accessing Premier Network's various accounts used to service clients. She testified that no one at Premier Network was able to access the company accounts from April 13, 2016, until after June 9, 2016, when a state court order was obtained requiring the Debtor to turnover the usernames and passwords needed to access the accounts.

Ms. Surprenant testified that she could not access her Premier Network email from November 2015, when her laptop was wiped, until after the court order on June 9, 2016. When asked by her own attorney about who Premier Network's email provider was, she stated Comcast. But on cross examination, she testified

that her Comcast account was her personal email account, to which she always had access. Later, she changed her testimony and said that Premier Network's email was through GoDaddy and that its internet service provider was Comcast.

Ms. Surprenant estimated that Premier Network lost approximately twenty clients in the nearly two months that its accounts could not be fully accessed. She identified a list of clients lost during that period and stated that the list was accurate with the exception of two listed clients, one of whom came back to Premier Network after three months and another that she believed had left but actually had not. Ms. Surprenant stated that ten of the listed clients were part of Premier Network's website-hosting service and could not be serviced without account access. Although the clients could not be serviced, Ms. Surprenant testified that she reached out to clients and that she and Jeff Williams personally met with clients to explain that Premier Network's services were limited at that time.

Even though Ms. Surprenant claimed that clients left because Premier Network could not access its accounts to offer full services, she admitted that it was possible that the clients left because the Debtor was no longer employed with Premier Network. She acknowledged that the Debtor had personal connections with many of the clients. Further, Ms. Surprenant also admitted that clients were not required to sign service contracts and could leave Premier Network whenever and for whatever reason.

Testifying about ownership interests in Premier Network, Ms. Surprenant

mentioned the possible existence of a fifty-percent partnership agreement she had entered into with the Debtor written on the "back of an envelope." She testified that, about six months after Premier Network was incorporated, the Debtor insisted on having something in writing that said he was a fifty-percent owner. Ms. Surprenant acknowledged that conversations about the Debtor buying an interest in Premier Network continued after the Debtor moved out of her home. Although she claimed that no purchase agreement was ever entered into, she identified a copy of a handwritten agreement, dated March 21, 2016, wherein she agreed to sell Premier Network to the Debtor for $15,000. She admitted that her signature was on the document but claimed that she only signed the agreement because she felt intimidated and threatened by the Debtor. She explained that, on the day the agreement was signed, she met with the Debtor at the Perrysville Avenue location to collect checks made out to Premier Network but that the Debtor would not give her the checks unless she signed the agreement. Notwithstanding the agreement, Ms. Surprenant said that she never received any payment from the Debtor for an interest in Premier Network.

The Debtor was called as a witness by Premier Network and testified that he has associate degrees in network and computer communications and internet and web design development and a certificate in PC programming. He also described his extensive employment background in IT service, including his time at DTI and Premier Network. He started working at Premier Network at the time of its formation in May 2014 as an IT consultant. His duties included sales, client

recruitment, selecting vendors, customer support, IT services, bookkeeping, invoicing, and various office responsibilities. The Debtor denied being involved in the formation of Premier Network and stated that he did not have an ownership interest in the company.

The Debtor also confirmed that he and Tammy Surprenant had a personal relationship and that he moved into her home in November 2015. He agreed that the relationship faltered and that Ms. Surprenant had demanded that he leave her home on February 22, 2016. According to the Debtor, after leaving Ms. Surprenant's home, he checked into a Sleep Inn and Suites in Danville, Illinois. He admitted to making charges at the hotel of $224.05 and $940.80 on February 22, 2016, on his Premier Network credit card. The Debtor asserted that he had used the Premier Network credit card at hotels on prior occasions when he and Ms. Surprenant were fighting and no objection had ever been raised to those charges.

In addition to the hotel charges, the Debtor admitted to making a $1601.84 charge on February 23, 2016, at a Meijer store, on his company credit card. Although he originally claimed not to remember what he purchased at Meijer, he eventually admitted that he purchased gift cards. When asked what he bought with the gift cards, he stated that he bought towels, shampoo, and other household items.

The Debtor testified that Ms. Surprenant had not given him written or oral authorization to make the charges at the hotel or Meijer store. He explained,

however, that he and Ms. Surprenant had both regularly used the company credit cards for personal purchases in the past, that authorization had never been required before, and that Ms. Surprenant had never objected to his use of the the company credit card for hotels on other occasions. He said that he did not make the charges because he was mad at Ms. Surprenant for asking him to leave her home.

According to the Debtor, Ms. Surprenant visited him at the hotel to discuss the future of their relationship and the possibility of him buying Premier Network. The Debtor asserted that Ms. Surprenant told him to start transitioning Premier Network's affairs to his name and to move the business out of her home. As a result of that conversation, the Debtor filed an address change for Premier Network with the United States Postal Service and opened an account for Premier Network at DBCU. He denied making an address change for Premier Network with the IRS. He also moved the company's operations into an office space located in Shick School and Office Supply at 801 Perrysville Avenue, Danville, Illinois.

With respect to the DBCU account, the Debtor explained that he actually opened a personal account because DBCU did not offer business accounts. He stated, however, that he included Premier Network's name on the address line of the account application and that the address listed for the account was the Perrysville Avenue location. Although he acknowledged changing Premier Network's address and creating a new financial account, he admitted that he did not have written authorization from Ms. Surprenant to do so.

The Debtor admitted to signing and depositing several checks made payable to Premier Network, totaling $6134.40, into the DBCU account on February 26, 2016. He said that he was later informed by Ms. Surprenant that Premier Network needed money to pay bills. He then withdrew $6130.40, in two checks made payable to Premier Network, from DBCU and gave those checks to Ms. Surprenant for deposit into the First Financial Bank account.[1] He closed the DBCU account after learning there was no need for a new financial account because the company's existing bank accounts could be transferred to him when he became the owner of the company.

The Debtor confirmed that his employment with Premier Network was terminated on April 13, 2016. On that same day, he filed a declaratory judgment action against Tammy Surprenant in state court, seeking a determination that he had an ownership interest in Premier Network. He testified that, in turn, Premier Network filed a lawsuit against him on April 25, 2016, seeking the turnover of company passwords and usernames, the Quickbooks software, and checks made payable to Premier Network.

The Debtor testified that Premier Network obtained a state court order requiring him to provide it with the Quickbooks software, usernames and passwords, and checks made payable to Premier Network. He stated that he believed he had complied with the state court order but acknowledged that an

---

[1] The $4.00 difference between the deposited amount and the withdrawn amount was due to service charges made against the account during the short time it was open.

order for contempt was entered against him on June 9, 2016, for not complying with the state court's prior order. He testified that he fully complied with all state court orders by June 15, 2016.

The Debtor further testified that, while he was employed by Premier Network, he maintained the usernames and passwords for the company's accounts and kept them in file folders at Tammy Surprenant's home office. He said that the username to access the client accounts was his Premier Network email and that the password was a common password he used for everything, including his own personal banking. The Debtor denied that he withheld the usernames and passwords because he was mad at Ms. Surprenant.

After his termination, the Debtor continued to use the Premier Network accounts that were held in his name, and he contacted Premier Network clients to offer his services through his new company, Illiana Technology Solutions. He asserted that clients were not contractually obligated to Premier Network and that he had not signed a non-compete or non-solicitation agreement preventing such contacts.

Tim George testified that he was the CEO of DBCU from 2012 to 2017 and that, while he was the CEO, Premier Network provided IT services to DBCU. He stated that, when IT services were needed from Premier Network, the Debtor would be the one who provided services. He never saw Tammy Surprenant provide IT services. In fact, Mr. George did not know Tammy Surprenant had an ownership interest in Premier Network until she was introduced to him by the

Debtor as a partner in the company.

Mr. George confirmed that the Debtor opened a personal account at DBCU on February 25, 2016. He acknowledged that the Debtor listed Premier Network on the address line of his application, allowing for checks made payable to Premier Network to be deposited into the account. Mr. George testified that, pursuant to a longstanding policy, DBCU does not offer business accounts. He explained, however, that checks made payable to a business could be deposited into a personal account if the business name was listed on the address line of the account. Mr. George admitted that the Debtor never provided proof that he owned Premier Network, nor was proof requested or required to create the account. He stated, however, that the Debtor informed him that he was a partner in Premier Network and that he was actually going to buy the company. Later, the Debtor asked Mr. George and DBCU to hire the Debtor's new company for IT services, but DBCU chose not to hire the Debtor's new company due to the pending state court litigation between Premier Network and the Debtor.

Blake Wasson, the current IT manager for Premier Network, testified that he was hired by Premier Network in April 2016, after the Debtor's employment was terminated. He stated that, at the time he was hired, Premier Network did not have access to the accounts used to service clients. He claimed that no one at Premier Network had the passwords and usernames needed to access the accounts. Mr. Wasson explained that he could not find login information for the accounts in Premier Network's files or records at Ms. Surprenant's home office

and that his attempts to reset the passwords failed because he also did not have access to the email account needed to reset the passwords. The account service providers were contacted directly by Mr. Wasson but would not grant access to the accounts without sufficient proof of ownership of the accounts.

With respect to specific accounts, Mr. Wasson identified about a dozen different vendors with which Premier Network had accounts used to service clients and explained briefly what service each vendor offered. He said that at least six of the accounts were not held in the name of Premier Network but, rather, were in the Debtor's individual name. He identified two other accounts that he believed were in the Debtor's name, although he was not sure of that information.

According to Mr. Wasson, because the accounts could not be accessed, Premier Network was unable to provide full service to its clients. Rather, Premier Network could only offer limited on-site technical support. Mr. Wasson stated, however, that he and Ms. Surprenant personally met with clients within the first two weeks of his employment to introduce him as Premier Network's new IT technician and to inform them that available services were limited. In addition, Mr. Wasson said that a new phone number to contact Premier Network was provided to clients because the previous phone number was associated with an account that could not be accessed and because calls to that number were automatically forwarded to the Debtor's cellular phone.

Eventually, Premier Network regained access to all but one of the accounts needed to service its clients. According to Mr. Wasson, most of the information

needed to access the accounts was provided pursuant to a state court order entered on May 25, 2016. The rest of the information needed to access the accounts was received shortly after a subsequent state court order was entered on June 9, 2016.

Mr. Wasson estimated that Premier Network lost twelve to fifteen clients in the period of time that it could not access its accounts and also attributed the loss of clients to the Debtor's solicitation of Premier Network clients. He admitted, however, that, because the clients were not bound by contracts with Premier Network, they were free to use the Debtor for IT services. He also testified that Premier Network had lost clients for other reasons since he was hired, typically due to the cost or type of services available.

Adam Underwood, a certified public accountant, was called as an expert witness by Premier Network. Mr. Underwood testified that he had a degree in finance and was engaged in the private practice of accountancy, providing accounting, tax, and management services. In particular, Mr. Underwood said that he specialized in business-formation consulting and coaching and that he regularly taught classes for small business owners. After Mr. Underwood stated his credentials, Premier Network tendered Mr. Underwood as an expert in the areas of business finance and accounting. The Debtor raised no objection to Mr. Underwood providing expert opinion testimony.

Mr. Underwood said that his relationship with Premier Network began at the time of its formation. He had provided Ms. Surprenant with advice on

incorporating her business and had continued to periodically provide accounting services to Premier Network. He testified that he was familiar with the business operations of Premier Network and had been asked to give an opinion as to the amount of the losses suffered by the company due to its loss of clients after the Debtor's termination.

In reaching his opinion, Mr. Underwood reviewed the list, prepared by Tammy Surprenant, of clients who had left Premier Network during the period of time when Premier Network claimed not to have full access to its accounts. He also reviewed cancelled checks he had been given that showed payments made by some former clients to the Debtor or the Debtor's business after his termination from Premier Network. He also consulted Premier Network's records regarding its revenue history with the lost clients. Based on his review of all of that information, he opined that Premier Network had losses of approximately $178,000 due to the Debtor's conduct.

Mr. Underwood explained that he had looked at the revenue previously generated by the lost clients and, if a client had been with Premier Network for three years, he multiplied the annual amount of gross revenue generated from that client in the past by three to estimate the loss for the next three years. If a client had only been with Premier Network for a year, he included only one year of lost revenue in his calculation. He also added into his calculation any amounts the lost clients were shown to have paid to the Debtor or his business after the Debtor's termination.

The Court questioned Mr. Underwood directly about his calculations. He acknowledged that, for example, if a client was projected to spend $1000 with Premier Network over the next year, that amount was included in his loss calculation, and if he found that client had actually spent the $1000 by buying IT services from the Debtor, that payment to the Debtor of $1000 was also added into the calculation, making the total loss calculated for that client $2000. Mr. Underwood provided no explanation or justification for increasing Premier Network's projected loss if the client spent money with the Debtor rather than with a third party for IT services. In response to the Court's question, Premier Network's attorney asked Mr. Underwood whether removing the approximately $60,000 paid to the Debtor by lost clients from his loss calculation would still result in a significant loss by Premier Network, and he agreed that it would.

On cross-examination, Mr. Underwood admitted that Premier Network had been in business for slightly less than two years when the Debtor was fired. He explained that he had used the three-year term in his loss calculations because he thought customers who had been with Premier Network that long would have a solid relationship likely to continue. He did not explain why he assigned three-year relationships to most clients when those relationships had existed for two years, at best. He also admitted that he relied solely on the list provided by Ms. Surprenant to determine what clients were lost. He made no client contacts and had no personal knowledge of which clients left or why they left. Mr. Underwood agreed that in calculating losses, he should have deducted revenues for computer

purchases or other one-time expenditures by clients that would not be regularly repeated. He said that he had tried to make such adjustments in his calculations but could not say for sure that all such expenditures had been deducted.

Gary Dyar, the owner of the building at 801 Perrysville Avenue in Danville, Illinois, also testified. Mr. Dyar said that, in 2014, his company, Shick School and Office Supply, had purchased computers from and entered into a maintenance contract with Premier Network. He stated that he would normally contact the Debtor whenever he needed service on his computers because the Debtor had specific knowledge of the unique software system he used. Mr. Dyar said that he became aware of the Debtor's departure from Premier Network only after receiving a letter, dated April 19, 2016, from Premier Network and Tammy Surprenant. He said that he made the remaining payments required pursuant to his maintenance contract with Premier Network but chose to actually use the Debtor's IT services thereafter because he did not want to pay someone new to learn about the unique software on his computers.

To the apparent surprise of all parties, Gary Dyar brought with him two envelopes, taped together, that he had discovered in his safe the night before. One of the envelopes contained a handwritten agreement inside. The other envelope had handwriting on its surface. The handwritten agreement inside the one envelope was an original of the agreement dated March 21, 2016, between the Debtor and Tammy Surprenant. The handwriting on the outside of the other envelope indicated a date of "1/21/16" and appeared to say the following:

> Premier Network Solutions is owned by
>
> Tammy Surprenant 50%
> Bernie McCarty 50%
>
> Neither party shall be fired with this agreement. Only a
> buyout shall take place to end this company and neither
> party can start a new company without the other party
> getting a fair share buyout.

The handwritten portion included the signature of Tammy Surprenant but not the

signature of the Debtor. Other writing on the envelope appeared to say "Business

to Bernie after my ½."

In order to allow the parties and their attorneys time to fully review the

newly produced documents, the trial was recessed and set for a continued date.

The parties agreed that an evidence deposition of the balance of Gary Dyar's

testimony would be conducted. In fact, the evidence deposition of Mr. Dyar was

completed, and the parties stipulated to its admissibility at the commencement

of the continued trial.

In his evidence deposition, Mr. Dyar testified that he rented office space to

the Debtor in his Shick School and Office Supply building located at 801

Perrysville Avenue, Danville, Illinois. He initially said that he began renting to the

Debtor in 2017, then said August 2016, and finally said the lease began in late

April 2016. He said that he traded IT services for rent, and he believed that he

began renting to the Debtor only after the Debtor was terminated from Premier

Network and had started his own company.

Mr. Dyar further testified that the Debtor had, at some point, approached

him about having mail sent to his office building. The only mail he ever saw related to the Debtor was addressed to Illiana Technology Solutions. He never saw mail addressed to Premier Network at the Perrysville Avenue address. He admitted, however, that his secretary dealt with the mail, and, if mail addressed to Premier Network was sent to his building, he might not have seen it.

Regarding the envelopes that he had discovered in his safe, Mr. Dyar testified that the Debtor showed him the envelopes sometime after April 22, 2016, when he visited the Debtor in the rented office space. Although he had limited recall about the specific conversation, Mr. Dyar said that the Debtor had indicated that he had reached an agreement with Tammy Surprenant and asked Mr. Dyar to put the envelopes in his safe.

The Debtor testified again at the continued trial. When asked by his own attorney about why he testified that he was not an owner of Premier Network despite the agreement written by Ms. Surprenant on the envelope, he said that he did not have any documents to prove their agreement. He then identified the envelope produced by Gary Dyar with the handwritten language on its surface as a fifty-percent partnership agreement he had entered into with Ms. Surprenant. He explained that he knew the agreement existed but thought it was lost after he was unable to locate it.

With respect to the March 2016 agreement, the Debtor testified that he took steps to obtain funds for his purchase of Premier Network. Specifically, he sought financing from banks, a small business loan from a local association, private

investors, and even looked into withdrawing funds from a retirement account. But, before he could put together his financing, his employment was terminated. The Debtor denied that he was threatening or coercive towards Tammy Surprenant in relation to the agreements. He also denied knowing Ms. Surprenant's educational background or the level of her expertise in the IT field.

Tammy Surprenant also testified again. She admitted that she wrote the January 2016 agreement, with the exception of the phrase set off to the side of the agreement that said "Business to Bernie after my ½." Similar to her testimony regarding the March 2016 agreement, Ms. Surprenant asserted that she felt threatened by the Debtor at the time that the January 2016 agreement was made. She explained that they were on a service call and sitting in a car when the Debtor started yelling at her about having a written agreement. She claimed that she wrote the agreement out of fear. In addition, she reiterated that she demanded that the Debtor leave her house on February 22, 2016. Ms. Surprenant added, however, that she had called the police to assist in having the Debtor removed from her home.

At the conclusion of trial, the parties presented closing arguments. The matter is ready for decision.

## II. Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois

have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). The determination of the dischargeability of a particular debt is a core proceeding. 28 U.S.C. §157(b)(2)(I). This matter arises from the Debtor's bankruptcy itself and from the provisions of the Bankruptcy Code and may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).

## III. Legal Analysis

Premier Network seeks to except the debt it claims the Debtor owes it from the Debtor's discharge. Generally, exceptions to discharge are construed strictly against a creditor and liberally in favor of a debtor. *In re Morris*, 223 F.3d 548, 552 (7th Cir. 2000). The statutory provisions providing exceptions to discharge should be "narrowly construed so as not to undermine the Code's purpose of giving the honest but unfortunate debtor a fresh start." *Park Nat'l Bank & Trust of Chicago v. Paul (In re Paul)*, 266 B.R. 686, 693 (Bankr. N.D. Ill. 2001); *see also Lamar, Archer & Cofrin, LLP v. Appling*, ___ U.S. ___, 138 S. Ct. 1752, 1758 (2018). The creditor seeking to except a debt from discharge bears the burden of proving each element of its cause of action by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). Each cause of action must be reviewed separately. Before reaching the merits of those causes of action, however, the threshold issue of the credibility of the principal witnesses must be discussed.

*A. Neither the Debtor Nor Tammy Surprenant*
*Were Fully Credible Witnesses.*

The Debtor and Ms. Surprenant each testified twice at the trial and neither was fully credible. It was obvious from both of their testimonies that, when their personal relationship ended in February 2016, perhaps not surprisingly, they were unable to maintain a civil business relationship. Their personal breakup impacted Premier Network and resulted in the termination of the Debtor's employment, two state court lawsuits, the Debtor's bankruptcy, and this adversary proceeding. Their ongoing animosity towards each other also colored their testimony in this case, raising questions about the credibility of both of them.

The Debtor's testimony included repeated claims that he could not recall pertinent facts. Although the trial here occurred three years after the events that gave rise to the complaint, the Debtor had testified in state court and been examined on the same issues several times over the years. Thus, his persistent lack of recall was frustrating not only for Premier Network's attorneys but also for the Court. And his lack of recall suggested he was not being candid in his testimony.

One example of the Debtor's questionable credibility related to the charge he made using his Premier Network credit card at a Meijer store on February 23, 2016—the day after he moved out of Ms. Surprenant's home. In a pre-trial statement signed by his attorney and filed April 27, 2018, the Debtor said that, when he had moved in with Ms. Surprenant, he had given away his furniture and

-24-

household goods. He said that Ms. Surprenant offered to replace some of those items when she asked him to move out and that he purchased the replacement items at Meijer using the Premier Network credit card. When asked about the Meijer purchases at trial, however, he said he could not recall what he purchased and specifically responded to a series of questions about possible items purchased by saying he could not recall. But when he was directly asked, to his apparent surprise, if, in fact, he had actually used the Premier Network credit card to purchase gift cards at Meijer, he admitted that was the case. None of his testimony about the use of the credit card at Meijer rang true; his initial denials of any recall seemed disingenuous and proved to be just that.

Another example of questionable credibility occurred near the end of the trial when the Debtor denied any knowledge regarding Ms. Surprenant's educational background or her expertise in the IT field. Based on the prior testimony of both parties, it did not appear to be disputed that Ms. Surprenant handled the non-IT aspects of the business and that she did not have the expertise to do the technical, IT service work offered by Premier Network. Nevertheless, when asked about his knowledge of Ms. Surprenant's education and technical skills, the Debtor denied any knowledge of her education or abilities. It was simply not credible that, after working for several years in two different IT businesses with Ms. Surprenant and after dating her for some period of time and living with her for several months, he would have absolutely no knowledge of her education or IT skills and abilities. It was clear to the Court that he was denying

that he had knowledge about Ms. Surprenant just to be difficult and to refuse to cede the point, even though the point had clearly been established earlier in the trial.

Ms. Surprenant's credibility issues arose not from a lack of recall but from a series of explanations of her conduct that either conflicted with other evidence or made little sense. For example, she said that, as soon as she saw the hotel charge made on the Debtor's Premier Network credit card the day after he moved out of her home, she placed the credit card on hold. But she later said that the she did not intend to cancel a pre-authorized debit on the card related a client service, even though the charge would have been disallowed if she had actually effectuated a hold on the card. And she never testified that she even mentioned to the Debtor that she had placed a hold on the card or had restricted usage of the card. To the contrary, she admitted that Premier Network never made a formal claim against the Debtor prior to the filing of this adversary proceeding to repay any of the credit card charges.[2]

Likewise her testimony regarding what occurred in the operation of the business after the personal breakup did not ring true. She said that she called the police when she was asking the Debtor to leave her home. Ms. Surprenant did not say whether she thought the Debtor would not leave without a police presence or

---

[2] Premier Network provided no affirmative evidence regarding any demand ever made on the Debtor regarding his credit card usage. On cross-examination, Ms. Surprenant volunteered that she had asked the Debtor to repay the charges, but she provided no details of when, where, or how she made that request.

if she feared some violence. Either way, having called the police to assist in removing the Debtor from her home, she could not possibly have expected him to return to work at her home office—the only office Premier Network had. Thus, her expression of total surprise and dismay that the Debtor found a free office in a client's building was disingenuous. The Debtor may well have gotten ahead of himself and his buyout discussions with Ms. Surprenant when he put in the change of address forms and opened the DBCU account. But the Debtor's finding of a neutral spot to work from was a natural and expected consequence of Ms. Surprenant's decision to have him leave her home with a police escort.

Although Ms. Surprenant's personal decision to have the Debtor move out of her home may well have been the right choice for her, she never offered any explanation of where or how she thought the Debtor was going to conduct Premier Network business after he was barred from her home office, even though it was obvious that she expected him to continue to work. Absent Premier Network providing an alternate working space, the Debtor's actions in finding a free office appear to have benefitted rather than harmed Premier Network. Ms. Surprenant's complaint about this issue lacked credibility.

In presenting the factual disputes and the legal issues, the testimony of both the Debtor and Ms. Surprenant was critical. And, in deciding the issues presented, this Court relies to some extent, on the testimony of both witnesses. Unfortunately, neither witness was totally forthright. The Debtor prevails here but not because he is an "honest but unfortunate debtor" entitled to the liberal

protection of the Court. Rather, it is because Premier Network did not put forth a complete, credible case establishing its entitlement to an exception to the Debtor's discharge.

### B. Any Debt Owed by the Debtor to Premier Network Will Not be Excepted From Discharge Under § 523(a)(4).

In its complaint, Premier Network says that the debt it claims is owed to it by the Debtor should be excepted from the Debtor's discharge pursuant to §523(a)(4) of the Bankruptcy Code. 11 U.S.C. §523(a)(4). Section 523(a)(4)provides that a discharge does not discharge a debtor from a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." *Id.* Defalcation as a fiduciary, embezzlement, and larceny are three separate and distinct causes of action, and the elements of only one of them need be proven to except a debt from discharge. *See Vozella v. Basel-Johnson (In re Basel-Johnson)*, 366 B.R. 831, 847 (Bankr. N.D. Ill. 2007). Here, Premier Network claimed that the Debtor was a fiduciary who had breached his duties, and Premier Network's attorney argued at the close of trial that the Court should find that the Debtor was guilty of fraud or defalcation as a fiduciary. Nothing was alleged or argued by Premier Network to suggest that the Debtor's conduct constituted embezzlement or larceny. Accordingly, only the issue of whether Premier Network met its burden on a cause of action for fraud or defalcation as a fiduciary will be discussed.

Premier Network claimed that the Debtor was a fiduciary to it but cited no

case law in support of its position. A fiduciary relationship may arise from an express trust or from a relationship where there is "a difference in knowledge or power between fiduciary and principal which . . . gives the former a position of ascendancy over the latter." *In re Marchiando*, 13 F.3d 1111, 1116 (7th Cir. 1994). The exception to discharge for defalcation by a fiduciary "reaches only those fiduciary obligations in which there is substantial inequality in power or knowledge in favor of the debtor seeking the discharge and against the creditor resisting discharge[.]" *In re Woldman*, 92 F.3d 546, 547 (7th Cir. 1996). To impose a fiduciary duty under §523(a)(4), the relationship must be of the type that compels the imposition of the "same high standard" as required of a trustee of an express trust and where the creditor has reposed "a special confidence in the fiduciary[.]" *Marchiando*, 13 F.3d at 1115-16. Examples of the types of relationships that create fiduciary duties and may bring §523(a)(4) into play are attorney-client, director-shareholder, and managing partner-limited partner relationships. *In re Frain*, 230 F.3d 1014, 1017 (7th Cir. 2000).

Here, of course, no express trust exists; Premier Network relies solely on the Debtor's employee relationship to Premier Network to claim that the Debtor is a fiduciary. Ms. Surprenant testified that she was the sole owner, officer, and director of Premier Network. She claimed that the Debtor was no more than an at-will employee, and her unilateral firing of the Debtor in April 2016 was based on that premise. The Court finds that on the issue of ownership and control of Premier Network, Ms. Surprenant proved by a preponderance of the evidence that

she was the owner of the company and that the Debtor was not. The parties'
March 2016 agreement may have given the Debtor a right to buy Premier Network,
but no sale ever took place. And the back-of-the-envelope agreement written on
January 21, 2016, was also never effectuated. Regardless of any rights the Debtor
might claim he acquired by that document, he and Ms. Surprenant never created
a partnership nor was any stock ever transferred to him. More importantly, he was
never elected as a director or officer of Premier Network. The Debtor was merely
an at-will employee of Premier Network.

Generally, employees are not fiduciaries to their employers, as that term is
defined for purposes of §523(a)(4). *See Yankowitz Law Firm, P.C. v. Tashlitsky (In
re Tashlitsky)*, 492 B.R. 640, 646 (Bankr. E.D.N.Y. 2013); *Shearson Lehman
Hutton, Inc. v. Schulman (In re Schulman)*, 196 B.R. 688, 698 (Bankr. S.D.N.Y.
1996); *Ohio Co. v. Maynard (In re Maynard)*, 153 B.R. 933, 935 (Bankr. M.D. Fla.
1993). The fact that an employee may have a skill or knowledge that the employer
does not possess in a field required to do the job for which the employee was
hired, does not make the employee a fiduciary. Rather, fiduciary duties are only
imposed under §523(a)(4) where there is "substantial inequality in power or
knowledge in favor of the debtor." *Woldman*, 92 F.3d at 547.

Premier Network failed to prove that the Debtor stood in a fiduciary
relationship to it. The Debtor was an at-will employee and was treated as such at
the time of his termination. Premier Network and Ms. Surprenant cannot have it
both ways. The Debtor was not an owner, shareholder, officer, or director of

Premier Network and cannot be held to standards that may only be imposed if he held one of those positions. Premier Network failed to meet its burden of proof on a key element of its cause of action under §523(a)(4), and, accordingly, there is no need to review the other required elements of the cause of action. The Debtor was not a fiduciary to Premier Network, and that ends the inquiry. Judgment will be entered in favor of the Debtor and against Premier Network on the issue of whether any debt he might owe Premier Network should be excepted from his discharge by reason of fraud or defalcation as a fiduciary.

### C. Any Debt Owed by the Debtor to Premier Network Will Not be Excepted from Discharge Under § 523(a)(6).

Premier Network claims that the debt allegedly owed to it by the Debtor should be excepted from the Debtor's discharge because the debt involved a willful and malicious injury to Premier Network's property. Section 523(a)(6) provides an exception to discharge for debts "for willful and malicious injury by the debtor to another entity or to the property of another entity[.]" 11 U.S.C. §523(a)(6). In order to prevail under this exception to discharge, a creditor is required to prove: (1) that the debtor intended to and did cause an injury to the creditor's property interest; (2) that the debtor's actions were willful; and (3) that the debtor's actions were malicious. *Basel-Johnson*, 366 B.R. at 849 (citations omitted).

For purposes of §523(a)(6), "'willful' . . . modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a

deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis in original). Under *Geiger*, a creditor must prove that the debtor actually intended the harm caused by the conduct complained of and not just that the debtor acted intentionally and harm ensued. *Id.* at 61-62. The term "malicious" refers to acts taken "in conscious disregard of one's duties or without just cause or excuse[.]" *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994). Although maliciousness requires an intentional act, no specific intent to do harm is required to prove that an act was malicious. *Id.*

The debt Premier Network claims is owed to it by the Debtor includes the disputed credit card charges and losses suffered due to the inability to provide services to clients after the Debtor was fired by Premier Network. Each component of Premier Network's claim must be analyzed separately to determine dischargeability.

### 1. The Credit Card Charges Made by the Debtor Will Not be Excepted from His Discharge Under § 523(a)(6).

Premier Network claims that the charges made by the Debtor on his Premier Network credit card at a hotel and at a Meijer store after he moved out of Ms. Surprenant's home constitute a debt that should be excepted from his discharge. A debt exists when there is "liability on a claim." 11 U.S.C. §101(12). Premier Network had the burden of proof to establish that the Debtor was actually liable to Premier Network for the charges. At least as to the hotel charges, Premier

Network did not meet that burden.

The Debtor testified that neither Premier Network nor Ms. Surprenant had placed restrictions on his use of the credit card. He had previously used the card before for hotel expenses when he and Ms. Surprenant had fought and he had left her residence; his testimony in that regard was not disputed. Although Premier Network was not obligated to provide the Debtor with a place to live, it was obligated to provide him a place to work; he was expected to continue to work and, apparently, he did so. Ms. Surprenant said that she contacted the credit card company about the charges but not that Premier Network ever made a formal demand on the Debtor to pay back the charges. Accordingly, this Court finds that the charges for the hotel made by the Debtor on his Premier Network credit card were consistent with prior charges and company practices. The Debtor has no liability on Premier Network's claim for reimbursement, and there is no debt owed to Premier Network for the hotel charges. Because there is no debt owed for the hotel charges, there is no debt to be found nondischargeable.

The Debtor's charge at the Meijer store presents a closer case. With respect to that charge, Premier Network also never made a formal claim for reimbursement until the filing of this adversary proceeding. But the Debtor also refused to honestly explain the charge, putting forth one explanation for the charge in his pre-trial statement, denying any recollection of the charge initially at trial, and then admitting that he bought gift cards after being specifically asked if that was the case. Because of the Debtor's own lack of credibility with respect

to the charge at the Meijer store, the Court cannot find that the charge was consistent with prior credit card usage or was allowable even by Premier Network's obviously broad charging policies. Thus, despite no prior formal claim being made by Premier Network regarding the charge, the Court does find that Premier Network can state a claim that a debt for reimbursement of the Meijer charge exists.

But the existence of a debt is only the first step in the analysis. Premier Network had the burden of establishing that the Debtor's conduct in creating the debt was willful and malicious. And, although the Debtor was not credible in explaining the debt, the Court cannot draw the inference from the limited evidence provided that Premier Network met its burden on the issue of willfulness.

As set forth above, willfulness requires not only an intentional act but also an intent to actually injure or harm the other party. *Geiger*, 523 U.S. at 61. Here, the Debtor was obviously acting in his own selfish interest. Maybe he was buying items to get started in a new place as he first said was the case. Maybe he was stockpiling the gift cards to do so at a later date. Regardless, all of the motivations that the Court can infer from the evidence presented suggest that the Debtor was trying to benefit himself with little thought to the consequences of his actions on Premier Network. And it was clear that, at the time, he was hoping to acquire Premier Network in whole or in part. He had no incentive or motive to actually cause willful or malicious harm or injury to Premier Network. The Court finds that Premier Network failed to prove that the Debtor's debt to it incurred by the Meijer

charge was the result of actions of the Debtor undertaken with the intent to cause harm or injury to Premier Network. Accordingly, the debt related to the Meijer charge will not be excepted from the Debtor's discharge.

### 2. Any Business Losses Suffered by Premier Network are Not Debts that Will be Excepted from the Debtor's Discharge Under § 523(a)(6).

In its complaint, Premier Network alleged that the Debtor had taken unauthorized possession and control over its assets. At trial, Premier Network presented some evidence regarding the Debtor's taking of checks made payable to Premier Network and depositing them into the DBCU account he had opened. But the evidence also established that he returned the funds to Premier Network when requested to do so and that Premier Network suffered no loss due to the Debtor's opening of the DBCU account. Premier Network concentrated its presentation on an alleged loss of clients and an alleged resulting loss of income caused by the Debtor's taking of usernames and passwords related to client and vendor accounts when he was terminated. Premier Network failed, however, to establish by a preponderance of the evidence that the Debtor's conduct resulted in a debt being owed by him to Premier Network or that property of Premier Network was injured by the Debtor's actions.

Ms. Surprenant presented an exhibit on behalf of Premier Network listing twenty-four clients that she said left the company after the Debtor's termination because the company did not have access to the usernames and passwords for the

software used to serve the clients. She later reduced the number to twenty-two after identifying two clients who she said should not have been on the list. She said that ten of the listed clients received web-hosting services, but she did not identify those clients by name. And when the expert witness, Mr. Underwood, presented his calculations, only one allegedly lost client was shown as having purchased web-hosting services. Ms. Surprenant did not testify that any client's use of its own website was in any way interrupted due to Premier Network's inability to provide services for a period of time. Ms. Surprenant did not testify that she had actual knowledge of the reason why any specific client left Premier Network or that she even attempted to find out why specific clients left. Not one Premier Network client was specifically identified as having left Premier Network due to the company's inability to provide services.

Two clients that were listed—Shick School and Office Supply and DBCU—had representatives testify at trial, albeit primarily with respect to other matters. Neither representative said that their companies left Premier Network because of Premier Network's inability to provide services due to lack of access to usernames and passwords. To the contrary, Gary Dyar said that Schick School and Office Supply had continued to pay all sums due under its maintenance contract with Premier Network after the Debtor's termination but that he had hired the Debtor to do continuing IT work because the Debtor was familiar with his company's unique software. Tim George said that the Debtor had asked for DBCU's IT business after his termination but, because of the pending state court

litigation, DBCU had not hired the Debtor. Mr. George did not specifically say, nor was he asked, whether DBCU stayed with Premier Network or went elsewhere for IT services. If, however, DBCU did leave Premier Network because Premier Network could not provide needed service without access to its usernames and passwords, Mr. George was the witness that could have established that fact. But, surprisingly, Mr. George was not asked the question, and the Court cannot assume that, had he been asked, his answer would have supported Premier Network's claim.

The evidence also established that a number of the software-vendor accounts that Premier Network was unable to access because it did not have the usernames and passwords were held in the name of the Debtor individually. It was not clear whether the accounts were initially acquired by the Debtor in his individual name or whether he changed the registration of the accounts to himself at some later point. Further, if the usernames and passwords for the accounts were not written down but simply stored in the Debtor's head, then Premier Network has a tough case to prove that the Debtor wrongfully took the information when he was fired. Ms. Surprenant makes no claim that she asked the Debtor for the information when she terminated him; she apparently did not even know she needed the information until days later. Mr. Wasson testified about the accounts held in the Debtor's name, but he did not elaborate on the specifics of how the accounts were used and what clients, if any, were specifically affected by the lack of access to particular accounts. Thus, there was a lack of proof of specifically

what property of Premier Network, if any, was injured by the Debtor.

Both Ms. Surprenant and Mr. Wasson said that Premier Network lost clients because the Debtor had entered into competition with Premier Network and some clients had chosen to hire the Debtor. The Debtor said that he did not have a non-compete or non-solicitation agreement with Premier Network and that he started his own IT business when he was fired from Premier Network. Premier Network provided no evidence that the Debtor was prohibited from competing against it, and its attorneys cited no authority for suggesting that he was prohibited from doing so. Nevertheless, Premier Network suggests that it was damaged and should be compensated for losses related to the Debtor's taking of the company's clients.

Under Illinois law, if the Debtor had been a partner, majority shareholder, officer, or director of Premier Network, his conduct in competing against Premier Network might have constituted a breach of fiduciary duty. *See generally Hagshenas v. Gaylord*, 557 N.E.2d 316, 321-25, 199 Ill. App. 3d 60, 68-73 (1990). But he held none of those positions. Ms. Surprenant and Premier Network took the position that the Debtor was an at-will employee who could be fired at any time; he was terminated on that basis. Again, Ms. Surprenant and Premier Network cannot have it both ways. If the Debtor could be fired at any time because he was simply an at-will employee, fiduciary duties that would be imposed only on an owner, director, or officer cannot be imposed on him after his termination. Premier Network is not owed a debt by the Debtor or entitled to collect damages from the Debtor on account of clients lost due to the Debtor's competition after his

termination.

Premier Network failed to prove that the Debtor owed a debt to it due to its alleged loss of clients after his termination. The Debtor was free to compete with Premier Network for clients at the time, and the evidence suggested that a number of clients left Premier Network and went with the Debtor. At best, Premier Network might have established a debt related to clients who left because they could not receive needed or requested service during the time Premier Network did not have its usernames and passwords. But, despite Ms. Surprenant's belief that Premier Network lost clients for that reason, Premier Network presented no evidence of any specific client that was lost for that reason. Thus, Premier Network failed to establish the existence of any debt that might be excepted from the Debtor's discharge.

The lack of proof of any debt for business losses owed by the Debtor to Premier Network could end the inquiry under §523(a)(6). But Premier Network's proofs fell short in several other ways that bear mentioning. The testimony on damages by Premier Network's expert was needed to establish a compensable injury, but the expert's calculations did not follow Illinois law on the proper measure of damages. And Premier Network failed to meet its burden of showing that the Debtor's conduct was willful.

Mr. Underwood's calculations were faulty from the beginning because the underlying information provided by Ms. Surprenant to him was inaccurate. He calculated losses based on the twenty-four clients she initially claimed were lost,

even though, by the time of trial, she had admitted that her list included clients who had not left Premier Network. And the list clearly included some clients who had left Premier Network to go with the Debtor—lost clients for whom no compensation should be awarded.

The calculations were also problematic because, even if Mr. Underwood had correct data from Premier Network, he used the wrong measure of damages in reaching his opinion. Generally, Illinois law provides that, when measuring damages for loss of income and profits to a business, the appropriate measure of damages is lost net profits. *See Sterling Freight Lines, Inc. v. Prairie Material Sales, Inc.*, 674 N.E.2d 948, 951, 285 Ill. App. 3d 914, 918 (1996). Because at least some of the direct expenses of providing a service or conducting a business are not spent when there has been a breach of contract or some other compensable injury to the income stream of a business, those direct expenses must be deducted in calculating damages. *Id.* Here, however, Mr. Underwood used gross revenues and did not account in any way for the direct expenditures not made when services were not provided. He did say that he thought he had deducted one time charges for equipment purchases that would not be repeated. But he did not deduct and, apparently, did not even consider how to calculate Premier Network's losses based on the required standard of net profits. This error alone would justify disregarding his testimony completely.

Mr. Underwood also said that he had used a three-year projection for his lost-revenue calculation. His explanation for the use of three years was that he

thought that, if clients had been with Premier Network for three years, it was reasonable to think that they would stay another three years. Whether that belief was reasonable may be debatable. What is not debatable is the fact that, at the time the Debtor was terminated and the losses allegedly occurred, Premier Network had only been in business for slightly less than two years. When confronted with that discrepancy, Mr. Underwood provided no other credible justification for the use of a three-year loss period in his calculations.

Finally, Mr. Underwood admitted that his damages opinion included not only the lost gross revenue he had calculated using Ms. Surprenant's lost client list but also revenue actually received by the Debtor and his new company in the months after he was terminated from Premier Network. He had apparently been provided with documentation regarding the receipts of the Debtor and his new company. Using that information, he projected that, if, for example, under his original calculations, Premier Network had lost $1000 due to a client leaving Premier Network and that same client spent the $1000 with the Debtor, Premier Network's loss increased to $2000. He provided no explanation for this double counting. And Premier Network's attorney provided no authority for adding the Debtor's receipts into the damages calculation.

During closing arguments, this Court asked Premier Network's attorneys about the correct measure of damages for lost business income. They agreed that it might be net profits and suggested that the Court should just find that the debt owed to Premier Network was nondischargeable. They said that they would then

go back to state court to have the exact amount of damages determined. But that course of action is not an option. As set forth above, this Court cannot find that any debt is owed by the Debtor to Premier Network related to the loss of clients. But even if it had found the existence of some debt, the testimony of Mr. Underwood would have been essential in precisely defining that debt and the injury sustained by Premier Network. Because Mr. Underwood's testimony was wholly unhelpful in determining whether Premier Network suffered any loss of net profits, the case would have been lost for lack of proof on that issue, even if it had not already been lost on the issue of whether a debt existed in the first place.

Premier Network also failed to prove that the conduct of the Debtor was willful. As set forth above, Premier Network had the burden to prove that the Debtor intended to harm Premier Network by his actions, not just that Premier Network was harmed. *See Geiger*, 523 U.S. at 61-64. No evidence of the Debtor's intent to harm Premier Network was presented. To the contrary, as soon as he was terminated, the Debtor filed a lawsuit against Ms. Surprenant asserting an ownership interest in Premier Network. He thought, albeit incorrectly, that he was entitled to claim an ownership interest in Premier Network based on the documents signed by Ms. Surprenant. All of the evidence suggests that he wanted to own and operate Premier Network, not that he wanted to harm Premier Network.

Ms. Surprenant's decision to terminate the Debtor may have been the right decision for her and for Premier Network—the Court offers no judgment or opinion

on that. But it is clear that she did not think through the consequences of an abrupt termination and had not sought the needed guidance of an IT professional before terminating the Debtor. Ms. Surprenant obviously did not have the IT skills and knowledge necessary to run her own business, and she apparently did not know that she needed the usernames and passwords to the business accounts in order to operate. But she fired the Debtor without asking for the information and now asks this Court to find that the Debtor committed a tortious act against Premier Network by being fired and leaving his employment with the knowledge he had in his head. As set forth above, that position is a tough sell; the Court finds it to be without merit.

The Debtor filed a lawsuit on April 13, 2016, and Premier Network sued him shortly thereafter. All parties believed strongly in their positions. It took until May 25, 2016, to get a preliminary order from the state court, and the testimony was that the Debtor turned over most of the requested information soon thereafter. It did take a second state court order to get the final information from the Debtor, but this Court still cannot find a specific intent to harm Premier Network from the testimony presented about the Debtor's compliance—or lack thereof—with the state court orders. Throughout the process, the Debtor was consistently trying to assert an ownership interest in Premier Network; none of the evidence suggested that he was trying to harm Premier Network. And no actual harm or injury to Premier Network by the Debtor was established.

Premier Network failed to prove that the Debtor owes it a debt that arose out

of a willful and malicious injury to Premier Network's property. The proof presented fell well short of what was required to establish the elements of the cause of action by a preponderance of the evidence.

## IV. Conclusion

Premier Network filed its complaint alleging that the Debtor's debt to it should be excepted from discharge because the Debtor had breached his fiduciary duties to Premier Network and had willfully and maliciously injured property of Premier Network. But Premier Network failed to prove that the Debtor owed most of what it claimed. With the exception of the $1601.84 charged at the Meijer store, Premier failed to prove that the Debtor was actually indebted to it for the sums claimed.

Importantly, Premier Network also failed to establish key elements of its causes of action. Ms. Surprenant's testimony clearly established that she was the sole shareholder, officer, and director of Premier Network; she exercised the authority derived from those positions to treat the Debtor as an at-will employee subject to termination at any time, for any reason. But that position, upon which Premier Network prevailed, forecloses finding that the Debtor was a fiduciary to the company or that the Debtor's right to compete against the company after termination was restricted. Further, no evidence of an intent by the Debtor to harm or injure Premier Network was proven. To the contrary, the Debtor wanted to own and operate the company; he had no incentive or intent to harm it. For all

of these reasons, judgment must be entered in favor of the Debtor.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###